Choate, D. J.
This is a suit in equity brought by the assignees in bankruptcy of the Hudson River Manufacturing Company, a corporation organized under the laws of New York, to avoid and annul certain judgments, executions and levies under the same. The grounds on which it is claimed in the bill that they should be avoided are — First, that they were an illegal preference under the bankrupt law; second, that they were the means of effecting a fraudulent assignment of the property of the bankrupt under the bankrupt law; third, that they were the result of a fraudulent conspiracy between the defendant Emma C. Penny, the execution creditor, and her husband, William G. Penny, who was also the secretary and treasurer of the corporation, to defraud the company; fowrth, that under the laws of New York the executions were dormant at the time of the levies, and, therefore, that the levies were void; and, fifth, that the judgments were opened before the commencement of the bankruptcy proceedings, and were not, at that time, judgments which could support the executions and levies. The defendant Hutton was the sheriff of Rockland county, by whom the levies under the executions were made.
The three judgments in question were recovered by the defendant Emma 0. Penny, in the marine court of the city of New York, on the twenty-third day of July, 1877, upon alleged notes of the corporation — one dated May 1, 1875, for *189 $2,000, payable one day after date; one dated July 1, 1875, for $1,000, payable one day after date; and one dated May 1, 1876, for $2,000, payable one day after date. The summons in each action was dated July 9, 1877, and was served on William G. Penny, the secretary and treasurer of the corporation, at the city of New York, on the tenth day of July, 1877. The complaints were verified July 21, 1877, and the judgments were entered by default. On the twenty-fifth day cf July, 1877, the judgments were docketed in the office of the clerk of Rockland county, and on the same day executions were issued to the sheriff of that county, with instructions to levy. On the twenty-sixth of July the attorney for the judgment creditor instructed the sheriff not to levy till he received further instructions. Levies were not made, as to part of the property, till August 28th, and as to the residue till August 31st; the attorney having given instructions to levy on the fourteenth of August, which were countermanded on the eighteenth of August, and not renewed till the twenty-seventh of August. The adjudication in bankruptcy was on the tenth of September, 1877, upon the petition of creditors, which appears, by the official certificate of the clerk, to have been filed on the thirtieth of August, but which the defendants claim was not in fact or in law filed till after the second levy was made, on the thirty-first of August. This difference, as to what is to be considered the proper date of filing, is unimportant, for reasons hereafter stated.
The claim that the executions became dormant by reason of the instructions given to the sheriff not to levy, and that, therefore, the levies are to be considered void as against the assignees in bankruptcy of the judgment debtor, is clearly not well founded. By the statutes of New York the goods and chattels of the judgment debtor are bound by the execution from the time it is issued to the sheriff to be executed, although no levy is made, except as against bona fide purchasers for value and subsequent judgment creditors. This lien of the executions is a lien which is preserved by the bankrupt law, if it is existing at the time of the filing of the petition. In re Hall, 18 N. B. R. 1; In re Stockwell, Id. 144. *190 An assignee in bankruptcy takes the property subject to existing liens. He is not a purchaser for value, but a volunteer. He cannot, therefore, avail himself of the objection that the execution is dormant, since the bankrupt himself could not do so; nor did the subsequent instructions to the sheriff, not to levy, impair or affect the lien created by the delivery of the execution to the sheriff, if that is to be upheld as a valid lien. Ferguson v. Lee, 17 Wend. 260; In re Week, 4 N. B. R. 364. Nor is there any basis for the suggestion that prior to the bankruptcy the judgments had been vacated, and that the executions and levies must fail on that account.
The only ground for this is that on the twenty-seventh of August, 1877, the judgment debtor applied to the marine court by motion, upon affidavit, to be allowed to come in and interpose a defence in said actions, and for other relief. Upon this application the court-granted an order to show cause, with a stay of proceedings under the executions until the hearing and determination of the motion. This stay was modified, however, so as to allow a levy to be made, and the first levy certainly was made before the commencement of the proceedings in bankruptcy. The motion did not come to a hearing till after the bankruptcy. It resulted in the granting of the motion for leave to come in and defend, leaving the judgments, executions and levies to stand as security. Answers were served under the leave so given, which were afterwards struck out as sham and frivolous. There was clearly nothing in this proceeding which affected or impaired the lien of the executions, if that was otherwise valid.
The further point made by the complainants, that the judgments and executions must be set aside as fraudulent in fact against the bankrupt and its assignee, cannot be sustained. It is unnecessary to consider the question raised by 'the defendants, whether this court would have jurisdiction to decree the nullity of the judgments and executions for this cause, as it is very plain that whatever cause of action of this nature, if any, the corporation had, it waived its right to this relief before the bankruptcy, and its assignees are bound by that waiver. The bill, indeed, puts in issue the existence- *191 of any indebtedness from the company to Mrs. Penny; but the proofs on this point do not admit of any doubt as to the fact that in the years 1875 and 1876 she loaned to the 'orporation, in three several sums, $5,000, the proceeds of the sale of her house in Brooklyn. Deposits in the company’s bank account, substantially corresponding in time and amount with the alleged loans and entries in the books of the corporation, corroborate her testimony to the fact. Slight discrepancies between the checks received from the purchaser and the amounts testified to by her as received, and between the actual sums received by her and her affidavit as to the amounts received, are not such differences as ought to be considered as impeaching her truthfulness. Such mistakes are of frequent occurrence, even with the most truthful persons.
It is insisted, however, that the loan stood merely as an open account for money borrowed; that no notes of the company were given for the loans at the times they were made; that shortly before the three suits were commenced a plan was formed between Mr. Penny, who was secretary and treasurer of the company, and his wife, to obtain for her an unlawful preference over the other creditors; and in pursuance of this plan, and to facilitate it, he, as treasurer, issued to her the notes sued on, dating them back to the times of the several loans, and making them respectively of the amounts not exceeding $2,000 each, so that they might be within the jurisdiction of the marine court of the city of New York, in which court judgment can be obtained in case of default in six days after service of the summons; that in further pursuance of this fraudulent scheme it was arranged that service of the summonses should be made on Mr. Penny, and that the fact of service should be c< aeealed from the other officers of the company, and so that default should be taken secretly and in fraud of the company; that this plan was carried out and the judgments were so obtained by default, and the executions were issued without any knowledge on the part of the stockholders, creditors or officers of the company, except Mr. Penny.. If all this were proved the company *192 would, doubtless, be entitled to some relief on account of the mode of serving the summonses, and the concealment of the proceedings.
The giving of the notes alone could hardly be considered any fraud. It is proved that the treasurer had full authority k> manage the financial affairs of the company and to give notes in its name. It would seem to be no fraud upon the company for him to give its notes for loans justly due, for which he might have given notes at the time the loans were made. But his accepting service of summons in his wife’s suits, with intent to have judgment taken by default, and the property of the company seized on execution to satisfy the judgment, even for a justly due obligation of the company, appears to be inconsistent with the relation of trust in which he stood to the company. It was a proceeding for his wife’s interest, and therefore for his own, which might seriously embarrass the company, and if the fact of the pendency of the suit were communicated to the other officers of the company some arrangement might be made with the creditor suing much more advantageous for the company. On this ground, probably, the court in which the judgments were obtained would, without hesitation, have set aside the service of the summonses as irregular and a fraud upon the defendant, if application had been promptly made for such relief upon discovery by its other officers of the fraud. Perhaps, also, the corporation could have disowned entirely the act of its treasurer, and in collateral proceedings the judgments might possibly have been held wholly void for want of jurisdiction in the court over the person of the defendant, the service of the summons being treated as wholly void. It is unnecessary, however, to determine that question, but such at all events would, as it seems to me, have been the utmost benefit which the corporation could claim from the irregularity. The defect in the judgment was at most a nullity, resulting from want of jurisdiction of the person.
How, then, was the fraud, assuming it to be fully proved, met by the company ? The fact that Mrs. Penny had recovered judgment on her claim was known to all the officers within a *193 few days after judgment was entered. It is true, they did not know that there were three judgments, and may have supposed there was but one. This, however, is immaterial. They knew the principal fact that the claim was in judgment, and if they did not know the details it was because they did not choose to inquire. On the first of August the-trustees passed a resolution, reciting “that she had recovered judgment, and was designing to enforce payment, and authorizing the president to execute a chattel mortgage in satisfaction of it. It is claimed that this resolution was obtained by fraudulent practices on the part of Mr. and Mrs. Penny, in pursuance of their design to secure her an illegal preference. But on the twenty-seventh of August, after all attempts to negotiate a settlement between the parties had terminated, and before the bankruptcy, the corporation applied to the court for leave to come in, have the defaults opened, and to defend the action, or for such other relief as the court might grant. I think it is impossible to contend that this did not cure and waive any defect in the service of the summons, except so far as that court might, upon this application, make the irregularity the ground of vacating the judgments, and setting aside absolutely, if it saw fit to do so, the service of the summons. It was clearly a submission to the jurisdiction of the court — a consent to receive such measure of reparation of the wrong done as the law, acting through that court, would award them. Prom the form of the papers used on the application, and the order to show cause obtained, it is, I think, more properly to be regarded as a motion to open the default, and to be let in to answer; in itself waiving, even in that court, all questions of jurisdiction. It seems to have been so understood at the time. But as an application for general relief it may be considered also as a motion insisting on the extreme view of the nullity of the service of the summonses, and the absolute vacation of the judgments; but the prayer was m the +he sltemative, and, in any view of it, it was a, submission to the jurisdiction, for the purpose of having the judgment of that court on the relief to which they *194 were entitled, including that based on the want of jurisdiction.
I think this proceeding clearly estops the corporation from taking the ground that the judgments are an absolute nullity in any collateral proceeding. The application could not have been withdrawn without leave of the court so as to reinstate the defendant in the position It was in, with respect to the judgment, before the application was made. It was not withdrawn before the bankruptcy. It was afterwards proceeded with to the knowledge and with the apparent concurrence of the assignees, and resulted in the validity of the judgments being established by the decision of the court. It is not necessary, however, to impute any particular efficacy to what was done after the petition in bankruptcy was filed. The corporation was already bound by its election of remedies. If the judgments might have been treated as absolutely void, by reason of the fraud, for want of jurisdiction, it had a right to elect between treating them so and going into the court in which they were rendered as a party defendant therein, and submitting itself to its jurisdiction, and obtaining such relief as it was entitled to there. It chose the latter course, and its assignee is bound by its election.
Thus far it has been assumed that the fraud is proved. I am not satisfied, however, that the notes were given to Mrs. Penny, as claimed, shortly before the suits were brought, and for the purpose of enabling her to bring the actions in the marine court. The notes themselves have nothing on their face to indicate that they were made long after their date. They are written upon blanks in use by the company at the time of their dates respectively, and not in use at the time the suits were brought. Mrs. Penny’s testimony is positive that they were given at or about their dates. It is a point on which she cannot be mistaken. I have examined with care the testimony of this witness and of the other witnesses, and while there are certainly some inconsistencies in her statements, and on some points she is seriously contradicted, I have not been able to reach the ccnclusion, to which the argument of the learned counsel for the complainants ear *195 nestly led, that she is entirely unworthy of belief. The only fact seriously conflicting with her testimony on this point is the fact that, in the books of the company kept by Mr. Penny, the notes were not entered. Upon the proofs as to the mode of keeping the books I think this fact is far from being sufficient to overcome her positive testimony of the fact of their receipt by her. The books were not scientifically kept. These loans were evidently regarded, both by Mr. and Mrs. Penny, as an investment in a business which was substantially his regular business. They were not notes which were expected to be paid or provided for upon their due day, or at any particular time. They were more in the nature of loans for an indefinite time, though the notes were, in form, payable in one day after date. This may, not unnaturally, have led to their being differently treated from notes and bills payable,- maturing and to be provided for at a time certain. Upon the whole evidence I think the preponderance of the proof clearly is that they were issued at or about their apparent date. There may be ground for suspicion to the contrary, but that is not enough to rest a conclusion upon against the positive testimony of the witness, and the evidence of the notes themselves.
As to the design and purposes of Mr. and Mrs. Penny those matters will be more properly considered in the discussion of the question whether there was an illegal preference under the bankrupt law. As it is found that Mrs. Penny is a creditor, it is unnecessary to consider further the point that the judgments, executions and levies constituted an assignment in fraud of the bankrupt law. That specification in the bill was probably inserted in view of the possibility that the evidence might show that there was no debt due Mrs. Penny, and that the design was to cover up the property of the bankrupt by a fraudulent assignment.
The only remaining question is whether there was an illegal preference within the terms of the bankrupt law. The burden of proof on this point is upon the complainants. They must prove that the security obtained by means of the judgment and lien of the execution was obtained by something *196 done, on the part of the corporation, which amounts to more than mere passive non-resistance to the enforcement, by judgment, of a valid claim. Wilson v. City Bank, 17 Wall. 473. They must also prove, by a fair preponderance of the evidence, that the corporation was insolvent, or in contemplation of insolvency, and that the security was designed to give the judgment debtor a preference, and that the creditor had reasonable cause to believe that the corporation was insolvent and knew that the security was designed to be a preference. It is not enough that the creditor suspects the debtor may be insolvent. He must have such a knowledge of facts as to induce a reasonable belief thereof. “He may feel anxious about his claim, and have a strong desire to secure it, and yet such belief as the act requires may be wanting.” Grant v. Bank, 97 U. S. 80.
It is unnecessary to discuss at length the testimony upon this issue. It is very voluminous and at some points conflicting. But in several respects the proof adduced by the complainants falls short of what is required to sustain the burden which is upon them. I think it is clear from the testimony that the primary purpose of the defendant Emma 0. Penny in suing the company was not to obtain a preference over other creditors, but to have her claim, as to the validity of which one of the officers of the company had in a suit against her husband expressed a doubt, secured or paid, and that this purpose had no reference to any insufficiency of the assets of the company to pay all the debts. It was in June, 1877, that this question was raised as to whether she had loaned the money to the company, and it at once led to her consulting counsel on the proper course for her to pursue. Her husband was also consulted. It was then concluded to wait till after the annual meeting of the corporation, which was to take place on the second of July, the suggestion being made that at that meeting the claim might be in some way recogubed by the company or security for it authorized. The matter was brought before the meeting and some discussion was had. The same person who had expressed doubt about it before expressed doubt about it then, and the meeting was adjourned *197 till the sixteenth of July without completing its business or recognizing Mrs. Penny’s claim. The next day Mrs. Penny again consulted her attorney, and it was decided to sue the company on the notes. The actions were commenced on the ninth or tenth of July, and service was made on Mr. Penny as secretary or treasurer, and he did not disclose the fact to any other officer of the company till after the judgments were obtained.
At the adjourned annual meeting, although directly asked by those present if there were any suits against the company, he denied that there were any except one for a small amount-for rent. This concealment of the pendency of the actions, considering his relation to the plaintiff, would, it seems to me, amount to such co-operation on the part of the corporation,, which in this matter acted by and through him as its officer,, as would satisfy the requirement of the bankrupt law, making-something more than passive non-resistance necessary.- But-there was not sufficient evidence either of the insolvency of the corporation, or of the intent to prefer on its part* or of knowledge of such intent, if it existed, on the part of Mrs. Penny. The evidence will not justify the conclusion' that the-corporation was in fact insolvent. None of the parties in-interest seem to have understood or believed that it was not able to go on with its business, or that it had not property enough to pay all its creditors. When the fact that Mrs. Penny had got judgment was known, negotiations were immediately commenced for some amicable arrangement by which she could be secured and the business of the company continued. She proposed to take the property and assume all the debts. This was found impracticable, because the officers other than Mr. Penny objected. The reason they gave was that the-property was worth more than the debts, and it would be sacrificing their entire stock. It is evident, however, that another reason was that it would throw the whole business and property into the hands of Mr. and Mrs. Penny, and exclude the other officers from the business. They were, some of them, hostile to Mr. Penny, and they were interested to keep the company alive and partly under their own control, *198 because its business was their business. It was then’ proposed that Mrs. Penny should take a chattel mortgage, payable in one year, in satisfaction of her judgments, and that all the other creditors should take notes at three, six, nine, and twelve months, with interest. This plan met the approval of the other officers and trustees, and on this basis negotiations took place between two of the largest creditors and Mrs. Penny. After this plan was proposed, and to promote it, the trustees passed a resolution authorizing the execution of such a chattel mortgage to Mrs. Penny in satisfaction of her judgment. This was on the first day of August.
Interviews followed between the two other creditors, who assumed to act for all the other creditors, and Mr. and Mrs. Penny and Mrs. Penny’s attorney. Some modifications were proposed in the plan. One was that in case upos foreclosure of the mortgage there should not be sufficient assets to pay Mrs. Penny and all the other creditors in full, the loss should be borne pro rata, in proportion to their several claims. The terms of the arrangement were explained to Mrs. Penny, and seemed to meet her approval. A final meeting was held on the seventeenth of August, at which she was not present, but Mr. Penny and her attorney in the actions were present and assumed to agree to the arrangement for her, and instructions were given to a lawyer at Nyack to draw up papers to carry the agreement into effect. The papers were drawn and were found incorrect and were altered. After several days delay Mrs. Penny finally refused to sign the papers and gave instructions to have levies made under the executions. Then followed the application to the marine court for relief against the judgments, and the actions of the other creditors, in co-operation with the trustees other than Mr. Penny, to throw the company into bankruptcy, in order to prevent Mrs. Penny from realizing any benefit from her judgment. This precipitated the ruin of the company. In what is disclosed by the evidence as to the assets and liabilities of the company up to that time, I fail to find evidence that it was insolvent in such sense as to make a security acquired by a creditor a preference. The statement made at the annual meeting was that *199 its liabilities were $17,000 and its assets $8,000, exclusive of its factory and machinery, which stood upon its books at $40,000.
In the propositions for settlement with Mrs. Penny, made or consented to by the other creditors, and in what is shown of the opinion of all the parties in interest, there is nothing to show that anybody valued the assets at less than the debts, but quite the contrary. The modification of the proposed agreement, securing a pro rata distribution in case of insufficiency of assets, was made with reference to a proposed continuance of the business for a year, subject, of course, to all the chances of business. It showed nothing of any present apprehension of insolvency on the part of Mrs. Penny or the other creditors.
It is claimed that Mr. Penny knew the exact condition of the company; that he knew it was insolvent; that his cooperating in the obtaining of the judgments, his concealment of the fact of the pendency of the action, and his course generally, show that his real purpose was to obtain a preference for his wife; that she is chargeable with knowledge of all that he knew because he was her agent. His action in concealing the pendency of the suits, and in not communicating the fact of the service made on him to the other trustees, is wholly indefensible, of course, but I do not think that the evidence as a whole shows that even his purpose was the obtaining a preference by his wife over other creditors.
There were other motives for his action, to which it can, in my judgment, be more probably attributed. In the first place, I see no reason to doubt that it was the evident hostility of some of the other officers of the company to his wife’s claim that induced him to give any assistance that he could, in the first instance, to its being secured by judg. ment. There is evidence that he was worried in mind by this hostility. He was also, at that time, not well in health. He desired to be continued in office as treasurer and secretary. The disclosure of the facts of the suits being brought might have prevented this, and the readiest way of shutting out all further question as to the liability of the company to her may *200 well have seemed to him to be, to suffer the judgment to be taken without telling the other trustees. It is also evident that he desired to get rid of the other officers and the stockholders, and he looked upon a possible sale of the property on execution, as a means to this end. He spoke of this to one of the other creditors.
On the question whether he was the agent of his wife in all this transaction, and especially in the negotiation for an arrangement with the other creditors, the evidence is not satisfactory. Giving full credence and effect to the narration of the conversations of Mrs. Penny, as testified to by the witness Crane, I think they do not contain any direct and unequivocal admission on her part that she had committed the whole matter of a settlement to her husband as her agent. Her saying to Mr. Crane that he (Mr. Penny) could do as he liked about it does not, under all the circumstances, amount to such an admission. She undoubtedly was consulting her husband, but she had her own attorney, and was giving him instructions from time to time. She seems, in fact, to have retained a considerable control over her own affairs, and not to have constituted her husband her general business agent, as the complainant’s counsel insists. It is, however, of little consequence whether or not she authorized her husband to give her consent to the final arrangement proposed with the other creditors. The only importance of it is as evidence in connection with her subsequent change of purpose, and other circumstances, as tending to show that she had from the beginning been acting an insincere part, and had at the time she acquired her lien been really in pursuit of an illegal preference over the other creditors. Even if she had expressly and unquestionably consented to sign the papers she refused to sign, there would have been in law no agreement which she can be charged with having broken. There was no agreement, because it is entirely certain from the papers themselves, as well as from the testimony, that the agreement, if made, was to be between Mrs Penny on one part, and all the other creditors on the other part. Mr. Crane and Mr. God *201 frey, who were or represented the largest of the other creditors, had no authority to act for all the creditors.
It is expressly proved that there were several other creditors who had not even been yet spoken to on the subject. No doubt Mr. Crane and Mr. Godfrey acted in entire good faith, and believed that all the others would unite with them; but so long as there remained any who had not given their consent to the proposed arrangement it bound no one, and any one who had consented was, in law, at liberty to withdraw. However censurable in morals such inconsistency on the part of Mrs. Penny may have been, it cannot be said that she broke any valid agreement in refusing to sign the papers. She alleges, in her excuse, that the violent language of one of the other creditors towards her and her claim led her to distrust the good faith of the other party. But, however this may be, I cannot think that this change of purpose on the part of a woman is sufficient to supply the evident lack of proof up to that time of the essential elements of the intent to give and to secure an unlawful preference.
As the lien of the executions attached on their delivery to the sheriff, the fact that the last levy may have been after the filing of the petition in bankruptcy is immaterial. There being no injunction from this court the judgment creditor could enforce her lien by a levy. It is, therefore, unnecessary to determine the question raised as to the true date of filing the petition. On the whole case the complainants have failed to prove the allegations of their bill.
I have not referred in this opinion to all the evidence, nor to all the able arguments of counsel upon the evidence, but both have been carefully considered.
Bill dismissed, with costs.